**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LEAH A. LAPKA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05 C 668** |
| | ) | |
| **MICHAEL CHERTOFF, Secretary,** | ) | |
| **Department of Homeland Security, and** | ) | |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF HOMELAND SECURITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Leah Lapka has sued Michael Chertoff, in his official capacity as Secretary of the
Department of Homeland Security ("DHS"), for sexual harassment and retaliation in violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, and has sued DHS for violation
of the Privacy Act, 5 U.S.C. § 552a.  Chertoff and DHS have moved for summary judgment on
all of Lapka's claims; Lapka has moved for summary judgment on her Privacy Act claim.  For
the reasons stated below, the Court grants the defendants' motion and denies Lapka's motion.

### Facts

For purposes of defendants' summary judgment motion, the Court views the evidence in
the light most favorable to Lapka, drawing reasonable inferences in her favor.

In 2001, Lapka began working for the Immigration and Naturalization Service ("INS"),
which is now part of DHS, as a District Adjudication Officer.  She attended a training course at
the Federal Law Enforcement Training Center ("FLETC") in June 2002.  The FLETC is located

in Glynco, Georgia, a restricted-access site that includes classrooms, a dining facility, and a bar. Trainees are expected to stay in designated housing. Lapka was assigned to stay at a Days Inn motel in Brunswick, Georgia, near the FLETC campus. On June 15, 2002, Paul Garcia, an INS inspector who was also attending training at the FLETC, asked Lapka and her colleague, Heather Lagacy, if they were interested in going to the bar at the FLETC base that evening. Garcia said he had a car and could give them a ride. After classes ended that day, Lapka and Lagacy decided to go to the bar and took a cab from the Days Inn to the FLETC base. While at the bar, Lapka met some other FLETC trainees and began socializing and drinking with them. During the course of the evening Garcia made sexual advances toward Lapka but she rebuffed them. After having several drinks, Lapka and Lagacy became intoxicated. They began dancing with a group of people, including Garcia. Lapka was visibly intoxicated while on the dance floor; she had difficulty standing up and spilled a beer she was holding.

Lapka and Lagacy left the bar with Garcia, who had offered to drive them back to the Days Inn. Lapka says that she passed out once they were back at the hotel because she was so intoxicated. She says that Garcia sexually assaulted her after she passed out. She has no recollection of what happened in her room before she came to, when she felt a sharp pain. When Lapka came to, she saw Garcia standing over her. Lapka says she tried to pull away from him, but he grabbed her legs, pulled her towards him, and continued to sexually assault her. She said she passed out again because she was intoxicated. The next thing she remembers is crawling to the bathroom because she was so sick. Lapka said she went to a hospital after she woke up because she was still very sick. At the hospital she reported a possible date rape and was treated for alcohol poisoning.

About two weeks later, Lapka reported the assault to local police and her FLETC instructors.  The police did not pursue criminal charges due to the lack of DNA evidence.  Lapka alleges the FLETC supervisors had a crisis intervention counselor meet with her but did not follow up and did not advise her of the necessary steps to file an internal equal employment opportunity ("EEO") claim.  Lapka says she was told in July 2002 that a report of the incident would be forwarded to the agency's inspector general and that she would hear from someone regarding the report.

In July 2002, Lapka returned to her Chicago workplace.  She says that she has been suffering from depression ever since the assault.  In March 2003, Lapka obtained a copy of the police report from the assault.  When she received the report, Lapka says she became even more depressed because she felt the police had investigated the matter inadequately and because she had heard nothing from FLETC officials.  Shortly thereafter, Lapka told her supervisor about the assault.  She says her supervisor expressed sympathy but told her that nothing could be done.  Lapka also inquired about the agency's investigation but was told the investigation was closed and that privacy and other considerations precluded release of the findings.

Lapka says that in May and June 2003, she saw Paul Garcia's brother, Jamie – who she says looked a lot like Paul and who was himself an inspector with a DHS agency – in the reception area of the office where she worked.  This, she says, made her very upset, and she contacted her supervisor to complain about Jamie's visits to the office.  Her direct supervisor put Lapka in touch with Phillip Browndeis, who was the next supervisor up the chain of command.  Browndeis suggested that Lapka consider filing an EEO complaint.  Lapka contacted the agency's regional EEO office, but an intake counselor told her the assault by Paul Garcia and the

encounters with his brother did not qualify as a claim under the EEO office's administrative process. Despite the EEO official's view, Lapka initiated an EEO charge the following month.

In August 2003, Paul Garcia visited Lapka's workplace on a day when she was off work. When Lapka learned of this, she became upset, and sought an order of protection in state court, to which Garcia agreed. Lapka reported the visit to her supervisors, who then instituted an office-wide policy requiring supervisor approval before any visitor not on official duty could be allowed entry to the Chicago office areas. Lapka also repeatedly urged her supervisors to bar Garcia from entering her workplace pursuant to the agreed order of protection. Lapka's supervisors explained that they did not specifically contact Garcia regarding the protective order because it was an agreed order; they concluded that Garcia was, by definition, on notice of the order.

Starting in July 2003, Lapka says, she filed several Privacy Act requests for documents about the June 2002 incident, but DHS declined to produce any records. Lapka appealed this decision to DHS's general counsel office in February 2004. Since that time, defendants have produced redacted copies of the documents Lapka requested.

Lapka also alleges that her supervisors retaliated against her for filing an EEO complaint detailing the assault and what she believed to be an inadequate follow-up investigation. Specifically, Lapka contends, her supervisors assigned her all the mandamus cases in the office as a collateral duty and assigned her more duties than she had previously been assigned for training new officers. She also alleges that her supervisors refused to take steps to protect her from harassment and transferred her to a different job site a few blocks away in retaliation for her EEO activity. Lapka also contends the DHS supervisors moved her because they were

uncomfortable with the sexual assault charge she was pursuing against another DHS employee. She also contends that defendants retaliated against her when her application for the Department of Labor's Employee Injury Compensation program was delayed and because defendants broadcasted her voluntary leave transfer program request nationwide but did not broadcast another request for her at the local level.

Lapka also complained of harassing phone calls from individuals she believes to be either Jamie or Paul Garcia, or people acting on their behalf. She filed a written complaint with DHS officials in January 2005; an internal investigation is still pending.

In March 2005, Lapka says, she was diagnosed with post-traumatic stress disorder. She is currently on indefinite medical leave from her job at DHS.

Lapka's amended complaint includes two claims. First, she claims that she was subjected to sexual harrassment "in that Defendant [Chertoff] failed to conduct a prompt and thorough investigation of Plaintiff's complaint of sexual assault by Paul Garcia, a coworker, after being duly notified by Plaintiff of said assault," Am. Compl. ¶ 111, by failing to take appropriate remedial action against Garcia, and by failing to address promptly the visits to her workplace by Garcia and his brother. *Id.* ¶¶ 113-14. Second, Lapka claims that DHS violated the Privacy Act by failing to comply with her requests for copies of the agency's reports about the assault and any follow-up investigation. *Id.* ¶¶ 117-19. In addition, in her response to defendants' motion for summary judgment, Lapka appears to contend that she was subjected to retaliation in violation of Title VII because of her complaints. *See* Pl. Mem. at 13-14.

**Discussion**

Summary judgment is proper only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to Lapka and draw all reasonable inferences in her favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

**1.      Sexual harassment / hostile work environment claim**

The Court deals first with Lapka's sexual harassment claim. To prevail on a claim of sexual harassment based on a hostile work environment, an employee must establish that she was subjected to unwelcome sexual harassment based on her gender, the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment, and there is a basis to impose liability on her employer. *E.g., McPherson v. City of Waukegan,* 379 F.3d 430, 437 (7th Cir. 2004).

An employer may be found liable for a hostile work environment created by employees who were not the plaintiff's supervisor only if the plaintiff proves that the employer was "negligent either in discovering or remedying the harassment." *Hrobowsky v. Worthington Steel Co.,* 353 F.3d 473, 477 (7th Cir. 2005) (quoting *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir. 1998)). In a case like this one, in which the harassment by a co-worker (the alleged assault by Paul Garcia) is not claimed to have been anticipated or foreseeable by the employer, the employer's liability depends on what it did, or did not do, after

the co-worker's conduct was brought to the employer's attention to prevent further harassment. *Parkins,* 163 F.3d at 1035.

Chertoff's first argument is that Lapka failed to exhaust administrative remedies, a prerequisite to suit under Title VII, because she did not contact a DHS EEO counselor in a timely fashion after the alleged assault by Paul Garcia.  In the Court's view, this reflects a misunderstanding of the nature of Lapka's Title VII claim.  The Court does not understand Lapka to be contending that the assault, by itself, amounted to a violation of Title VII by her employer.  Indeed, any such contention would be without merit.  An employer cannot be held liable under Title VII based on a sexual assault of an employee by a non-supervisory co-worker, *see, e.g., Shafer v. Kal-Kan Foods,* 417 F.3d 663, 665 (7th Cir. 2005), unless the employer knew or should have known the co-worker might engage in such conduct, *see, e.g., Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 446-47 (7th Cir. 1994), a contention Lapka does not make.  Rather, Lapka's claim is that DHS failed to take appropriate remedial and preventive action after she reported the assault and that this, together with the later visits to her workplace by the Garcia brothers, entitles her to recover against Chertoff under Title VII on a hostile work environment theory.

Chertoff's argument that Lapka failed to exhaust administrative remedies because she did not report the alleged assault by Paul Garcia to a DHS EEO counselor confuses a Title VII plaintiff's administrative exhaustion burden with what is required to trigger an employer's obligation to respond to a claim of co-worker harassment.  Chertoff cites no case supporting the proposition that a government employee who is the subject of sexual harassment by a co-worker must report the harassment to the government agency's EEO counselor in order to put the agency

on notice of the co-worker's conduct. Rather, an employer is considered to be apprised of harassment of which it was otherwise unaware if the employee "makes a concerted effort to inform the employer that a problem exists." *Hrobowsky*, 353 F.3d at 488 (quoting *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999). A jury reasonably could find that Lapka did this, with regard to the alleged assault by Garcia, by reporting the assault to her FLETC instructors – particularly in light of Lapka's claim that she was told that a report of the assault would be forwarded to DHS's inspector general.

To put it in a nutshell, Chertoff's exhaustion argument proceeds from an erroneous premise – that Lapka's hostile work environment claim is actually a series of discrete claims, one arising from the assault, a separate claim arising from the failure to investigate, and perhaps another separate claim arising from the Garcia brothers' later visits to her workplace. To the contrary, Lapka is making a single hostile work environment claim based on what she contends was the agency's inadequate response to her complaint about the assault, combined with the later visits by the Garcias, which she contends contributed to the hostile atmosphere she was required to endure. Chertoff does not argue in his motion for summary judgment that Lapka failed to exhaust administrative remedies for the unitary hostile work environment claim that Lapka is actually making. For these reasons, the Court rejects Chertoff's argument that Lapka failed to exhaust administrative remedies.

Chertoff also argues that no reasonable jury could find him liable on a hostile work environment theory based on his response to Lapka's complaint about the assault. "An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time

the allegations are made." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001); *see also, e.g., Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004). If an employer fails to take action to prevent further harassment or forces the victim to bear the costs of "solving" a problem she has reported, the employer may be held liable. *Shafer,* 417 F.3d at 665.

Lapka has identified nothing from which a jury reasonably could find that there was something DHS should have done, but did not do, to prevent further harassment by Garcia. Indeed, as discussed below, there was no further conduct by Garcia that reasonably could be characterized as harassment. Nor was there any real opportunity for Garcia to harass Lapka after the FLETC incident because they did not work in the same DHS agencies or in the same locations.

Lapka contends that the three visits by Jamie Garcia to the location where Lapka worked and the one visit by Paul Garcia created a hostile work environment in light of the earlier alleged assault by Paul Garcia. But as defendants point out, neither brother tried to contact Lapka, let alone harass her, during these visits; rather they were there to visit other former co-workers.

Moreover, it is undisputed that once Lapka made her supervisors aware of her concerns regarding Paul Garcia's presence in the office, the District Director immediately instituted and published a policy prohibiting non-work-related visits by anyone without supervisor approval. The one time that Jamie Garcia entered Lapka's workplace in violation of that policy, he was removed by a supervisor.

Under the circumstances, no reasonable jury could find DHS's response to the alleged assault by Paul Garcia, or to the Garcia brothers' later visits to Lapka's workplace, so deficient

as to give rise to employer liability under Title VII.  Even were one to assume that a reasonable jury could find that the Garcias' visits to other co-workers at Lapka's office subjected her to conduct "so severe or pervasive as to alter the conditions of employment and create an abusive working environment," *McPherson*, 379 F.3d at 438, there is no basis upon which a jury reasonably could impose liability on DHS for that conduct.

For these reasons, defendant Chertoff is entitled to summary judgment on Lapka's Title VII hostile work environment claim.

**2.      Retaliation claim**

Though Lapka's complaint includes no separate claim of retaliation, her response to defendants' summary judgment motion may be read as indicating that she is asserting a claim that the defendants retaliated against her for filing an EEO complaint.  *See* Pl. Mem. at 13-14. To sustain a Title VII retaliation claim under the indirect method of proof (Lapka presents no evidence or argument supporting a direct-method claim), an employee must present a *prima facie* case of retaliation by showing that after filing a complaint about discrimination only she, and not any otherwise similarly situated employee who did not complain, was subjected to an adverse employment action even though she was performing her job in a satisfactory manner. *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 642 (7th Cir. 2002).

Lapka contends that four employment actions constituted retaliation for her EEO claim: assigning her mandamus cases and other collateral duties without giving her adequate time to complete the assignments; reassigning her to an office located two blocks away; delayed processing of her applications for the Department of Labor Employee Injury Compensation program; and a delay in announcing her voluntary leave transfer program request.  Even

assuming that these actions, separately or together, qualify as adverse action, Lapka has presented no evidence that she was treated differently from any similarly situated employee who had not complained of harassment or discrimination. She thus has failed to offer evidence from which a jury could find that she had established a *prima facie* case.

**3.      Privacy Act claim**

Lapka has also asserted a claim under section 552a of the Privacy Act. She contends that she filed several requests under the Privacy Act but that defendants failed to comply. It is undisputed that defendants have since produced redacted copies of the documents in question. Both Lapka and DHS have moved for summary judgment on this claim.

The records Lapka sought under the Privacy Act were investigative reports and investigative files prepared by various federal agencies regarding the alleged wrongdoing committed by Paul Garcia. The records responsive to Lapka's requests were the reports of the investigation from FLETC Special Investigations and Security Division, INS Office of Internal Audit, and the United States Department of Justice–Office of Inspector General. Lapka requested copies of the reports and investigative findings regarding her report of sexual assault by Paul Garcia. In response to Lapka's requests, DHS explained to Lapka that the records were not about her, and that as a result it could not disclose the information contained in the documents because to do so would violate the accused's Privacy Act rights.

The Privacy Act provides that "[n]o agency shall disclose any records which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . ." 5 U.S.C. § 552a(b). Thus to prove a violation of this provision,

Lapka must first establish that the requested information was a record pertaining to her within the meaning of the Act. *See Tobey v. NLRB*, 40 F.3d 469, 471-72 (D.C. Cir. 1994). The Privacy Act defines "record" as

> any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph.

5 U.S.C. § 552a(a)(4).

The Privacy Act only permits an agency to disclose records about the requestor. Not every record that one might consider to be "about" a person in the colloquial sense constitutes a record of the individual as the Privacy Act defines that term. "The Privacy Act protects information that is 'about' an individual, not that which simply 'applies to' him. The latter category is a broad one, encompassing virtually all data that relates to an individual; the former, however, includes only information that actually describes the individual in some way." *Tobey,* 40 F.3d at 471-72.

Under the Privacy Act, records that are generated in response to a complaint are not records about the complainant but rather are considered records about the accused. *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1448-49 (9th Cir. 1985) (finding that a document must satisfy the initial requirement that it be a record "about the individual" to receive protection under the Act). In short, though the report of the investigation regarding the alleged assault by Garcia against Lapka might seem to be a record about Lapka, what Lapka requested was actually a record about Garcia under the Privacy Act's definition of that term.

Under the circumstances, no reasonable fact finder could find that DHS violated the

Privacy Act. For this reason, the Court grants DHS's motion for summary judgment on Lapka's Privacy Act claim and denies Lapka's motion for summary judgment on that claim.

**Conclusion**

For the reasons stated above, the Court grants the defendant's motion for summary judgment [docket no. 72] and denies plaintiff's partial motion for summary judgment [docket no. 77]. The Clerk is directed to enter judgment in favor of the defendant on all of plaintiff's claims. The trial date of January 8 , 2007 is vacated.

MATTHEW F. KENNELLY
United States District Judge

Date: October 30, 2006